## SCHENLEY DISTILLERS CORPORATION
### v. KINSEY DISTILLING COR-
### PORATION.
#### No. 7983.

Circuit Court of Appeals, Third Circuit.
Argued July 16, 1942.
Reargued May 14, 1943.
Decided June 2, 1943.

Earl Jay Gratz, of Philadelphia, Pa. (J. Maurice Gray, of Philadelphia, Pa., on the brief), for appellant.

William E. Mikell, of Philadelphia, Pa. (Maurice Bower Saul, Harry E. Sprogell, and Saul, Ewing, Remick & Harrison, all of Philadelphia, Pa., on the brief), for appellee.

Before GOODRICH, Circuit Judge, and SMITH and LEAHY, District Judges.

LEAHY, District Judge.

This is an appeal from a judgment rendered in favor of plaintiff on the pleadings, from which it appears that plaintiff holds certain warehouse receipts originally issued by Kinsey Distilling Company [1] for 18,632 barrels of whiskey. The terms of the receipts provided, in substance, that the whiskey would be delivered to the holder of the receipts upon payment of government taxes and storage charges of ten cents per barrel per month and surrender of the receipts properly endorsed.

Prior to the transactions involved in the case at bar, the Kinsey Distilling Company, the issuer of the receipts, filed its petition in bankruptcy in the court below. On July 16, 1941, pursuant to an order of the district court, the sale of the bankrupt's warehouse and other assets to defendant Kinsey Distilling Corporation was confirmed. On July 30, 1941, the bankruptcy trustees conveyed the warehouse and other assets to defendant, free and clear of all claims and liens in respect thereof and transferring such liens and claims to the fund realized by the sale. On July 25, 1941, plaintiff purchased the warehouse receipts around which the present controversy revolves.

---

[1] The name of defendant is Kinsey Distilling *Corporation*. There is no ownership connection between the two companies.

Defendant notified plaintiff that the storage charges for the whiskey would not be at the rate of ten cents per barrel per month as provided in the warehouse receipts issued by the bankrupt; but the storage charges would, on the contrary, henceforth be at the rate of fifteen cents per barrel per month and, in addition, defendant would make a handling charge of one dollar per barrel for delivery of the whiskey when it was removed from the warehouse. Plaintiff promptly protested, demanded delivery of its whiskey, tendered payment of storage charges at the rate of ten cents per barrel per month—in accordance with the terms of the warehouse receipts—and offered to remove the whiskey with the help of its own employees. Defendant refused to accede to these demands unless plaintiff paid the additional increased storage charges together with the dollar per barrel handling charge. To support its position, defendant denied it was bound by receipts issued by the bankrupt, and declined to surrender the goods except upon payment of the additional charges, or, at least, upon payment of its fair and reasonable charges. Moreover, defendant claimed a lien on the stored goods.

On September 23, 1941, plaintiff filed its complaint, the principal prayer of which was for an order on defendant to deliver the whiskey to plaintiff. The prayer of the complaint also sought a decree that plaintiff was not obligated to pay the defendant the increased storage charges or the dollar per barrel handling charges. Defendant filed its answer denying plaintiff had any cause of action and praying for dismissal of the complaint. The court below denied defendant's motion to dismiss, and granted plaintiff's motion for judgment on the pleadings.

The precise question before the court below and now before us is whether defendant is limited to compensation for storage and handling by the terms of the warehouse receipts issued by the former owner of the warehouse, now bankrupt, whose assets, including the warehouse, were sold to defendant at a judicial sale free and clear of all

liens against the bankrupt. The occurrences above stated all took place in Pennsylvania. Pennsylvania law governs, and the Pennsylvania cases, to the extent applicable, control.

The learned court below, while recognizing that there was no authority directly in point, was of the opinion that the case of German National Bank v. Meadowcroft, 95 Ill. 124, 35 Am.Rep. 137, lent support to the claim of plaintiff, viz.: that defendant was bound by the terms of the warehouse receipts issued by the bankrupt. It seems to us, however, that the cited case is inapposite, for the Illinois Court merely held that a purchaser at a private sale of a warehouse in which grain had been deposited was liable in trover for refusing to deliver grain to the holder of a warehouse receipt. Trover, of course, is the proper form of action for such a conversion. But in the instant case, defendant concedes that plaintiff is the owner of the whiskey.[2]

When the court below stated [42 F.Supp, 679, 682], "If defendant is not to be bound by the terms of a contract of storage to which it never agreed, plaintiff cannot be bound by the terms of a contract of storage to which it never agreed.", we think this was a correct view of the legal relation between the parties, for there is no true contract here involved because there is a total absence of mutual assent between the parties.[3] The warehouse was purchased at a judicial sale free and clear of all liens and charges against the bankrupt. In view of this fact, it is apparent that defendant did not by the mere purchase of the warehouse assume any obligations of the bankrupt. Any claim which plaintiff might have based upon the terms of the warehouse receipts was necessarily a claim against the bankrupt estate, for the receipts were contractual obligations of the bankrupt or its trustees in bankruptcy. The error committed by the court below exists in its failure to apply what it recognized as the correct rule.

---

[2] On October 22, 1941, the court below entered an interlocutory order directing plaintiff to pay defendant $1,863.20, representing storage at the rate of 10 cents per barrel for the month of August, 1941, without prejudice to the rights of the parties, and to pay into the registry of the court the sum of $35,000 to be ultimately awarded in accordance with the final disposition of the cause, and the order further directed defendant to surrender to plaintiff its 18,632 barrels of whiskey. Obviously, this was a highly sensible procedure.

[3] For distinctions between implied in fact contracts and implied in law or quasi-contracts, see Restatement of the Law of Restitution, Part I, Introductory Note, pp. 5–9.

352

■ Plaintiff was, like any other owner of goods stored without warehouse receipts or in the absence of an express contract, bound by a contract implied in law or quasi-contract to pay defendant a warehouseman's fair and reasonable charges, Gay v. Bates, 99 Mass. 263; Holman & Co. v. Graham, 165 Misc. 389, 300 N.Y.S. 850; Montgomery v. Berry, 31 Ga.App. 701, 121 S.E. 853. Quasi-contractual obligations are imposed or created by law without regard to the assent of the party bound, in order not to permit unjust enrichment. They have been enforced by the courts ever since Lord Mansfield's opinion in the case of Moses v. Macferlan,[4] 2 Burr. 1005 (K.B. 1760). Pennsylvania early enforced quasi-contractual obligations but at first the designation was "constructive contracts". Hertzog v. Hertzog, 1857, 29 Pa. 465, 468. Now, however, quasi-contractual obligations are designated as such. Cameron v. Eynon, 332 Pa. 529, 3 A.2d 423. It has thus become the settled rule that a quasi-contract arises where the law imposes a duty upon a person, not because of any express or implied promise on his part to perform it, but even in spite of any intention he might have to the contrary. We said in Bailis v. Reconstruction Finance Corp., 3 Cir., 1942, 128 F.2d 857, 859, that "Unlike true contracts, quasi contracts, are not based on the apparent intention of the parties to do or to forbear doing a particular thing. A quasi contract does not arise out of a promise. See Restatement, Contracts (1932) § 5. In fact it is imposed in direct opposition to the intention of the party charged therewith. Such contracts are the means which the law has adopted to raise up obligations in order to promote justice."[5]

Since there is no true contract here involved because of absence of mutual assent between the parties, it is clear that plaintiff must be liable in quasi-contract to prevent unjust enrichment. This rule imposes no hardship upon plaintiff for it is only required to pay fair and reasonable warehouse charges—and these sums, for all we know, may be more or less than those called for in the warehouse receipts which it now holds.

■ Moreover, in our view, Section 27 of the Pennsylvania Warehousemen's Receipts Act of March 11, 1909, P.L. 19, 6 P.S.Pa. § 23, which is set out in the margin[6], merely restates in statutory form the pre-existing law upon the subject. This section is the same as that contained in the Uniform Warehouse Receipts Act. The court below was of the opinion that Section 30 of the Pennsylvania Warehousemen's Receipts Act, 6 P.S.Pa. § 26, to which the provisions of Sec. 27 of the Act are expressly subject, was applicable and prevented defendant from asserting a lien for charges other than those enumerated in the outstanding warehouse receipts. In accordance with our view that the warehouse receipts issued by the bankrupt are not contractual obligations of the purchaser of the warehouse, Section 30 of the Act can have no application here. Moreover, that Section of the Act, by its express terms, is wholly inapplicable because defendant here issued no receipts for the goods involved.

The court below lays some emphasis on plaintiff's offer to remove the stored whiskey

[4] The basis of Lord Mansfield's opinion was doubtless to provide a more convenient remedy than the strict action of debt. In debt, wager of law was a method of trial. The oath of defendant that he did not owe the debt, fortified by the oaths of a number of his neighbors and kinsmen, called oath helpers or compurgators, that his oath was true, constituted a defense to the action. See Pollock and Maitland, History of English Law, Vol. II, 600, 634. There is a reported instance of its use as late as 1824 (King v. Williams, 2 Barn. & Cr. 538), and it was not formally abolished until 1833. See 73 Statutes at Large (384 Will, IV) c. 42, Sec. 13. In America, the practice never obtained a foothold. See Childress v. Emory, 1823, 8 Wheat. 642, 675, 5 L. Ed. 705. See Woodward, The Law of Quasi-Contracts, p. 2.

[5] See, also, American La France F. E. Co. v. Borough of Shenandoah, 3 Cir., 1940, 115 F.2d 866; Matoil Service & Transport Co. v. Schneider, 3 Cir., 1942, 129 F.2d 392; Woodward, The Law of Quasi-Contracts, p. 6.

[6] "Subject to the provisions of section thirty, a warehouseman shall have a lien on goods deposited, or on the proceeds thereof in his hands, for all lawful charges for storage and preservation of the goods; also for all lawful claims for money advanced, interest, insurance, transportation, labor, weighing, coopering, and other charges and expenses in relation to such goods; also for all reasonable charges and expenses for notice and advertisements of sale, and for sale of the goods where default has been made in satisfying the warehouseman's lien."

with the help of its own employees. Since we hold that plaintiff is bound in law to pay defendant a warehouseman's fair and reasonable charges, defendant was under no obligation to permit plaintiff to intrude upon the lawful operation of its business by accepting its offer of the use of plaintiff's employees.

We conclude that the judgment below should be reversed and the case remanded for further proceedings not inconsistent with this opinion.